UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
ANGELA COZZI,                                                      :
:
          Plaintiff,                                    :          <u>**MEMORANDUM AND ORDER**</u>
:
         - against -                                   :      05-cv-1389-ENV-WDW
:
GREAT NECK UNION FREE SCHOOL                                      :
DISTRICT, RANDOLPH ROSS, Principal of South                       :
Great Neck High School, LISSA BAILY, South                        :
Great Neck High School Foreign Language                           :
Department Chair, CHRISTINE MONTLOR,                              :
Chairperson of the Building Representation                        :
Committee, WILLIAM SHINE, Former                                  :
Superintendent of Great Neck School District,                     :
Individually and in their official capacities,                    :
:
          Defendants.                                   :
:
-------------------------------------------------------------------X

**VITALIANO, D.J.**

      Plaintiff Angela Cozzi brings this action against defendants Randolph Ross, Lissa Baily,

Christine Montlor, William Shine (collectively, the "individual defendants") and Great Neck

Union Free School District ("GNUFSD" or the "school district") under 42 U.S.C. § 1983, the

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Age

Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the New

York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"). Cozzi, who at all

times relevant to this action, was a tenured foreign language teacher employed by GNUFSD,

alleges that defendants (1) retaliated against her for an editorial she authored in a student

newspaper, in violation of the First Amendment; (2) removed her from her teaching position

without due process of law; (3) discriminated against her on the basis of an alleged disability, in

violation of the ADA; and (4) discriminated against her on the basis of her age, in violation of the ADEA. Defendants move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on all of these claims, and Cozzi opposes. For the reasons set forth below, defendants' motion is granted.

## I.    <u>BACKGROUND</u>

Plaintiff Angela Cozzi was born in May 1950. In 1985, she commenced employment with GNUFSD as a foreign language teacher in the Languages Other Than English ("LOTE") Department of South Great Neck High School ("South Great Neck"). Cozzi received tenure in 1989 and it appears was bound, at all times relevant to this action, by the terms of the Collective Bargaining Agreement ("CBA") between the GNUFSD Board of Education (the "school board") and the Great Neck teachers association. Cozzi worked for many years in the LOTE Department, teaching French and Italian, until the school board suspended her, as a result of disciplinary charges, on June 23, 2004. The charges and suspension prompt this lawsuit. Denying any violation of Constitution or law, defendants maintain that the school administration charged Cozzi in response to a longstanding, uncorrected pattern of inappropriate and unprofessional behavior and incompetence in the years leading up to the suspension.

### A.    **Cozzi's Relevant Work Performance History and First Amendment Allegations**

The evidentiary record proffered by defendants regarding Cozzi's performance at South Great Neck is substantial, and begins shortly following the 1997-1998 academic year. On June 18, 1998, defendant Randolph Ross, South Great Neck's principal, wrote a letter to Cozzi expressing concern regarding the final exam for plaintiff's French 1 class. Principal Ross voiced two criticisms. First, he disapproved of the fact that Cozzi had submitted the exam to the LOTE Department Head, defendant Lissa Baily, more than three weeks after the deadline set by the

department. Second, he noted that Cozzi apparently had not constructed the exam herself, but instead had submitted a test prepared by her Advanced Placement ("AP") students -- a fact that apparently became known to the students in French 1, breaching the security of the exam. As a result, Baily and other members of the LOTE Department were required to develop an alternate exam, which was ultimately administered. Cozzi provides a substantially different perspective. According to plaintiff's declaration, in 1998 she conducted a written exercise with her AP students which called on them to draft sample question and answer sets for French 1 students. However, plaintiff insists that, she, and she alone, drafted the questions and answer set for the French 1 exam that she submitted to Baily.

Defendants document no concerns regarding Cozzi's performance during the 1998-1999 academic year. In the following school year, however, matters changed. In December 1999, in response to numerous complaints from parents and students about plaintiff's teaching, Principal Ross sat in on Cozzi's French 11 class to observe her performance. In a December 13 report recounting his observations and evaluating plaintiff's work, Ross found that the complaints he had received were meritorious. Ross detailed a number of criticisms of Cozzi's teaching and concluded that the lesson he observed was "unsatisfactory" and that "improvement [was] necessary." (Defs.' Ex. I at 2.) Cozzi, in her declaration, takes exception to Principal Ross's conclusions and asserts that his contemporaneous report did not reflect the events that transpired in her class that day. She further asserts that she, as the instructor, knew best how to teach her students and was acting in her best judgment to do so.

Early the next month, on January 9, 2000, GNUFSD's assistant superintendent, Arlette Sanders, addressed a memorandum to Principal Ross notifying him that she had received a complaint letter from a parent of a student in plaintiff's French 11 class. Sanders informed Ross

that the parent had expressed several concerns about Cozzi and noted that one of the problems identified -- waning student motivation and diminished interest in French -- was of "paramount gravity" because the LOTE department already had "expressed concern that the French program [was] shrinking." (Defs.' Ex. K at 1.) Cozzi disputes the parent's opinion of the class's morale and avers, in sum and substance, that the student's perspective was not representative because she was often absent from or unprepared for class.

On May 8, 2000, Principal Ross made an unannounced visit to Cozzi's French 10 class in response to more parent complaints. In an accompanying report, Ross noted that his observation of the class validated some of the parents' concerns and expressed his own fear that "some of the problems identified earlier in the year in [plaintiff's] French 11 class have cropped up again." (Defs.' Ex. L at 2.) Ross stated that he provided Cozzi with instruction, enumerated in the report, on how to remediate these ongoing problems.

Nevertheless, in late May and early June 2000, Principal Ross sent Cozzi two letters detailing additional complaints from at least one parent and student. In the June letter, Ross "[o]nce again" told plaintiff that she had failed to create a student friendly environment in her French 10 course and instructed her that "[t]his needs to change." (Defs.' Ex. N at 1.) Ross also noted that he had ordered Cozzi to comply with GNUFSD policy about returning student assignments and directed her to turn in her final exams, which were again overdue, to her department chief. For her part, Cozzi states that she addressed the parents' concerns following Ross's May 8, 2000 observation and evaluation and avers that, in any event, the complaints were misplaced and a consequence of poor student performance, not her own.

On June 5, 2000, Ross and Baily completed a report evaluating Cozzi's teaching performance in the 1999-2000 academic year. The report praised plaintiff as a "masterful"

speaker of both French and Italian and noted her "firm[]" commitment to LOTE teaching. (Defs.' Ex. O at 1.) On the negative side, the evaluation stated that there had been "a number" of parent and student complaints about Cozzi's teaching throughout the year and that various concerns about her "relationships with students, organizational skills and appropriate exam practices . . . persisted." (Id.) Cozzi again counters that parent and student concerns were misplaced and that she adhered to district policy.

As the 2001-2002 school year drew to a close, on June 7, 2002, Baily transmitted a memorandum to Cozzi, with a copy to Principal Ross, regarding plaintiff's failure, again, to meet the deadline for submitting final exams. Baily informed plaintiff that her plan to submit the exams approximately three weeks late, on the last day of classes, was "unacceptable." (Defs.' Ex. R at 1.) Baily reminded plaintiff that she (Baily) still needed to review and package the tests before they could be administered, and that these tasks had to be put on hold while Cozzi delayed.

Less than two weeks later, Principal Ross held a meeting with Baily, Cozzi, and a union representative to discuss problems stemming from plaintiff's final exams. In a June 19, 2002 letter to Cozzi documenting the meeting, Ross noted plaintiff's repeated failure to meet the exam submission deadline and indicated that the administration had received "a number" of complaints from parents and students regarding her tardiness in informing students of the date and scope of the exam. (Defs.' Ex. T at 1.) Ross described plaintiff's conduct as "not acceptable," instructed her that it must improve, and noted that he was referring the matter to GNUFSD's assistant superintendent, Mary Bonner, for review and possible further action. (Id.)

Upon review of the matter, Assistant Superintendent Bonner issued a letter to Cozzi on July 3, 2002. Bonner noted that the number of students in Cozzi's courses had been

comparatively light, but that she still failed to meet the exam submission deadline, the third time she had done so in recent years. Bonner bluntly informed Cozzi that "such non-compliance with school rules must be corrected. Please consider this note to represent our extreme concern regarding your competence and performance." (Defs.' Ex. U at 1.)

Plaintiff does not seriously dispute that she submitted her final exam several weeks past the May 2002 deadline, or that she was counseled by her administrators for that conduct. Rather, she asserts that she explained to Baily the reasons for the delay. Specifically, Cozzi states that while development of a final exam in the LOTE Department ordinarily is a collaborative effort among several teachers, in the spring of 2002, she had to work alone to draft her exam. Cozzi says she was the only teacher in the department who was required to develop the test alone, despite having what she describes as an "exceptionally high student enrollment compared to previous years." (Cozzi Decl. ¶ 12.) Cozzi states that she assured Bonner that she would meet the submission deadlines in the future, and avers that she did so the following academic year, 2002-2003.

On October 22, 2002, one of Cozzi's students appeared ill, and perhaps under the influence of drugs, during class. Cozzi spoke to the student about his condition during class and afterwards and learned that he had previously used drugs. Plaintiff did not refer the student to a health professional and instead eventually sent the him on his way. When, a short time later, Cozzi encountered the student again in the school's parking lot and he indicated that he had missed a ride from his parent, she drove him home. Plaintiff reported the incident to an assistant principal and the nurse the next day.

On October 25, 2002, Principal Ross held a meeting with Cozzi, Assistant Principal Maureen Newman, and plaintiff's union representative, regarding the episode with the ill student

and a second, separate matter involving a confrontation between plaintiff and a student and parent. As to the latter issue, Ross told Cozzi that she could have avoided the confrontation and noted that "[w]e have spoken in the past about improving your relationships with parents and students. This incident indicates that you are still not meeting that goal." (Defs.' Ex. X at 1.) With regard to the ill student, Ross stated that Cozzi had failed to follow the school's drug policy as outlined in the teacher's handbook. Ross concluded that "[i]n each case, serious mistakes in judgment were made" and observed that "[e]xamples of poor judgment and relationships with students have continued this year despite counsel and correspondence from your Department Head, Principal, Assistant Superintendent and Superintendent." (Id. at 2.) Ross referred the matter to the assistant superintendent for further review.

As to these events, Cozzi claims that she did not believe that the ill student was under the influence of drugs; rather, she had learned only that he had previously used drugs, but was now clean. Cozzi asserts that she drove the student home only after obtaining permission to do so from his parent. With respect to the second incident, the confrontation with the student and parent, Cozzi insists that she acted appropriately and in a manner that reasonably should not have provoked a conflict.

On March 7, 2003, Principal Ross held yet another meeting with Cozzi -- and including Baily, an assistant principal, and a union representative -- concerning plaintiff's interactions with and conduct towards parents and students. The following day, Ross visited several of plaintiff's French classes to observe her performance. In a letter to Cozzi dated March 8, 2003, Ross stated: "[b]ased on my previous conversations and correspondences with you, my observation of your classes and a review of supervisory reports from previous years, it is my judgment that your relationships with parents and students, your preparation of exams and your organizational skills

have not improved.  This lack of progress is unsatisfactory and detrimental to your students and the French program at South [Great Neck]."  (Defs.' Ex. Z at 3.)  Cozzi admits receiving this criticism but disputes much of its substance.

Less than one month later, on April 1, 2003, Department Head Baily sent correspondence to Ross conveying her observations and conclusions regarding plaintiff's testing procedures. Baily observed that it was a goal of the LOTE Department to provide "clarity in instructions as well as a systemic presentation of our expectations" to students when drafting exams.  (Defs.' Ex. AA at 1.)  However, according to Baily, Cozzi had fallen short of this goal, by designing tests that lacked instructions and that did not make clear her (Cozzi's) expectations for her students.  Baily informed Ross that she could not "condone this type of testing."  (Id.)  Cozzi disputes this criticism and says that her student assessments always were consistent with school policy.

On May 13, 2003, Principal Ross, Cozzi, Assistant Superintendent Bonner, and others met to discuss the administration's ongoing concerns about plaintiff's teaching methods and her interactions with students and parents.  In a memorandum documenting the meeting, dated May 20, 2003, Assistant Superintendent Bonner noted that:

> [w]e agreed that in spite of the evaluation you received from Mr. Ross in June 2002 [(Defs.' Ex. T)], and the letter I sent you in July of 2002 outlining concerns for the school year 2001-2002 [(Defs.' Ex. U)], interactions with parents and students did not improve.  On May 13th, I informed you that if during the 2003-2004 school year these concerns continue the district will consider bringing this matter to a 3020A hearing [to determine whether there is just cause for plaintiff's dismissal].

(Defs.' Ex. BB at 1.)  Here, as elsewhere, Cozzi, acknowledges that the school administration voiced these concerns but disputes the substance of the criticism.

One month later, on June 18, 2003, Baily again wrote to plaintiff, this time regarding her apparent failure to review for accuracy documents from South Great Neck's guidance department identifying which French courses students were to be placed in the upcoming academic year. Baily noted that Cozzi's failure to "execute this simple but critical task caused a spillover of problems in scheduling and staffing" that required "considerable effort and time" on the part of the school's administration to correct. (Defs.' Ex. CC at 1.) Baily stated that it appeared that plaintiff did not know the proper sequence of courses in the French program, *i.e.*, which courses were prerequisites for others, and described her errors as a failure to fulfill "basic professional responsibilities." (Id.)

Criticism of Cozzi intensified in the second half of the 2003-2004 academic year. On February 6, 2004, Baily authored a memorandum to Principal Ross notifying him that Cozzi apparently had failed to keep abreast of recent changes in the requirements for the AP French exam. Plaintiff's AP students became concerned, noted Baily, when a substitute teacher explained the change that Cozzi had neglected to cover. Several days later, on February 9, Principal Ross completed a observation report detailing his assessment of plaintiff's instruction of the AP class. Ross was critical, noting, in sum, that the observed lesson was unsatisfactory and needed to improve.

As to the February 6 memorandum, Cozzi insists that she did keep abreast of the AP exam design and requirements. As to Ross's February 9 report, plaintiff avers that the problems the principal purported to observe were, in fact, caused by her alleged disability and by the fact that she taught the lesson in a social studies -- rather than a LOTE -- classroom.

On March 2, 2004, Ross again visited Cozzi's AP French class. In a letter to plaintiff dated March 5, Ross starkly observed that "the situation in this class has deteriorated to the point

that [it] is not being prepared properly for the Advanced Placement exam. . . . My recent observations indicate that this class is disorganized and not meeting the needs of the students." (Defs.' Ex. FF at 1.) As a result of these ongoing problems, Ross informed Cozzi that he was relieving her of her duties as the AP French instructor, effective the following work day, March 8, 2004. Cozzi, for her part, admits to having been relieved of her duties but asserts that Principal Ross was motivated to do so by discriminatory animus.[1]

On May 4, 2004, Ross sent Cozzi a letter documenting still another meeting between them regarding additional complaints about plaintiff's teaching performance. Ross noted several areas in which Cozzi had received criticism in the past but continued to perform poorly and concluded that "[i]t is my judgment that you are not being responsive to recommendations to help you improve your classroom performance and relationships with children and parents. Your performance this year continues to be problematic and unsatisfactory." (Defs.' Ex. II at 2.) Cozzi disputes the content of this criticism.

Several days earlier, on April 28, 2004, South Great Neck's student newspaper, *The Southerner*, had published a letter to the editor authored by Cozzi (the "April 28 editorial").[2] Cozzi's letter, which was entitled "LOTE teacher questions stress placed on enrollment in AP courses", stated as follows:

> Great Neck South is a high school that takes pride in having a high percentage of its students taking AP courses. We have been a lighthouse district among the best of the best, proven by the fact that 98% of our students go on to a four year college. Students, teachers, and parents all work hard to maintain this level of excellence.

---

[1] On the same day Principal Ross relieved Cozzi of her responsibilities for AP French, LOTE Department Head Baily drafted, at Ross's request, a four-page memorandum detailing her concerns about plaintiff's teaching methods, competency, and interactions with colleagues. The memorandum is highly critical of plaintiff's conduct.

[2] The parties agree that *The Southerner* had a limited circulation -- it was distributed only on school grounds, to students and faculty.

It is a well known fact that all colleges choose the members of their freshman class partly on the basis of the number of AP courses each student has taken. Therefore, clearly one way to impress any admissions officer is to take many AP classes. These same admissions officers almost never see the actual results of these AP exams.

AP exams are administered in early May each year. Some students elect not to take this exam. This exam actually measures a student's accomplishment in mastering the subject and each student is given a numerical score between one and five, five being the highest.

Based on [their AP scores], many students often place out of introductory course at college and thereby earn many free credits toward their baccalaureate. This practice gives our ambitious students the opportunity to earn a college degree by completing their course requirements much earlier than the customary four years. Therefore, Great Neck students, encouraged by their parents and their teachers, take as many AP courses in their high school years as they can manage. Furthermore, the whole school district supports and promotes this practice, since its "school report" is largely based on these two factors: 1) number of students taking AP courses and 2) percentage of students going on to four year colleges.

However, most AP courses are rigorous and have a heavy workload which often generates a lot of stress in students, parents, and teachers alike. Some of these courses are noted for being quite challenging, for example: AP Spanish is a walk in the park compared to the French or Latin AP. If the student's preparation in a course sequence leading to the AP exam is weak, the resulting AP scores will reflect it. Luckily these scores are of secondary importance since in most cases colleges almost never see them. It so happens that most college personnel including admissions officers are gone from the end of May to late August or September.

But the fact that the college or university calendar ends almost two months before high school, is actually a very good thing for AP students.

Come September all colleges and universities have their incoming freshmen [sic] class in place and therefore nobody sees and nobody cares about the actual AP scores attained.

Consequently, the question begs to be asked: Are these scores really important? If the primary reason for taking AP courses is to gain access to the university of your choice, once that objective is reached, why require students to work so hard to earn [a good score]? Who really benefits from that? Are students eager to learn a subject for the sake of excelling in it? There are some in this business of education that understand the difference between quantity and quality.

> There are still some colleges and universities that in the selection process do not discount ethical and moral attributes of its [sic] new members, that recognize and reward proof of excellence that goes beyond average; they know the difference between test-grade driven achievement and performance driven results. And, lastly, a "well-rounded" student learns in high school that to take responsibility for his/her own learning means to first look inwardly for improvements.
>
> Let's keep this high performance and strong commitment to excellence beyond the need to fulfill college admission requirements. Let's maintain our district['s] emphasis on quality education by making sure that the students who take AP courses are well prepared and just as important, that they are placed appropriately.

(Defs.' Ex. JJ at 1.)

Two days later, on April 30, Cozzi wrote to Ross, with copies to other members of the administration, informing them that another teacher in the LOTE Department, defendant Christine Montlor, had verbally harassed her in reaction to the April 28 editorial. According to Cozzi, Montlor had angrily confronted plaintiff about the letter and loudly criticized and demeaned her in front of other teachers. Cozzi requested that Ross call a meeting of all the members of the LOTE Department to address Montlor's comments, and asked that he do so quickly, as she stated that she was being ostracized. Plaintiff accused Department Head Baily of encouraging the allegedly inappropriate behavior and described the developing situation as "not conducive to the best teaching and learning atmosphere for all of us." (Defs. Ex. KK at 1.) Ross informed plaintiff on May 10 that he had begun to investigate her allegations but had not yet determined whether the group meeting she requested was appropriate.

On May 12, 2004, Ross sent plaintiff a memorandum notifying her that he had completed his investigation. Ross stated that he had met with each member of the LOTE Department to discuss Cozzi's allegations and detailed his findings as follows:

> [t]he overwhelming response of the department, with one exception, was that no one has engaged in or observed any unprofessional behavior towards you. Additionally, no member indicated that any direction or encouragement to behave unprofessionally towards you has been conveyed by Ms. Baily. I noted that some

members of the department were very upset with what you wrote [in the April 28 editorial].

Therefore, I see no compelling reason to meet with your department at this time and I find no evidence that your allegation is founded.

(Defs.' Ex. MM at 1.)

Cozzi contends that Ross's investigation was incomplete because he never interviewed her to obtain her account of the events. She also disputes his conclusions, arguing that Ross's finding that no one treated her unprofessionally is incompatible with the fact that Montlor admitted to Ross that she angrily confronted plaintiff and called her "the stupidest person on the face of the earth." (Defs.' Ex. NN at 1.)

On June 1, 2004, plaintiff received her 2003-2004 academic year evaluation report. The document, signed by Ross and Baily, was highly critical. Among the litany of horribles, the report noted that Cozzi repeatedly was unprepared, exhibited volatile classroom management, had lost the confidence of her students, and had generated numerous parent and student complaints. Moreover, plaintiff's relationships with her colleagues had also suffered as a result of her "divisive" behavior. (Defs.' Ex. PP at 1.) In sum, Cozzi's performance was "unsatisfactory", and "[d]espite repeated efforts to remediate her poor inter-personal relations with parents and students and her continued failure to prepare properly for her classes, her teaching has not improved." (Id. at 2.) Cozzi, again, discounts these criticisms and attributes them to defendants' discriminatory animus.

On June 9, 2004, Baily wrote a memorandum to Cozzi, with a copy to Principal Ross, regarding problems with the final exam for one of plaintiff's French classes. Baily noted that the test had been improperly prepared and that Cozzi had failed to administer a portion of the exam on the day previously designated by the LOTE Department. Cozzi disagrees with this

assessment only insofar as she says that she rescheduled the test in the exercise of her professional judgment, in order to avoid a conflict with a school activity.

**B.      Cozzi's Disability Discrimination Allegations**

In November 2002, Cozzi was injured in an automobile accident.  Plaintiff alleges that she sustained two herniated discs, rendering her disabled, and that defendants were aware of this disability.  Cozzi asserts that following the accident, she spoke to several of her supervisors and requested permission to teach out of a single classroom, explaining that she was making the request because teaching in multiple classrooms forced her to walk distances that caused her pain.  According to plaintiff, this request was denied.

Defendants dispute this version of events only insofar as they state that Cozzi never gave them any indication that she suffered from a disability.  They further assert -- and plaintiff does not deny -- that she had requested and been denied permission to teach out of a single classroom on several occasions prior to her accident.

In the spring of 2003, Cozzi repeatedly requested time off during the school day to obtain treatment from a physical therapist.  Plaintiff testified at her deposition that defendants knew the reason for her absences and, on one occasion, Assistant Principal Newman gave her a written reprimand when her return from a therapy session was delayed.  Defendants maintain that they did not know that plaintiff was requesting time off for treatment and point out that the only absence-related written reprimand from Assistant Principal Newman contained in the record states that the school administration believed Cozzi was absent because of a "dentist appointment".  (Defs.' Ex. Q at 1.)

During school hours the following academic year, in November 2003, Cozzi suffered from an apparent exacerbation of her physical ailments and was stricken with what she described

as extreme pain.  Plaintiff testified at her deposition that she told Assistant Principal Newman

and others that she suffered from herniated discs and, at the administration's order, she was taken

by ambulance to a local emergency room for treatment.  Plaintiff was released the same day and,

apparently, came to school the following work day.[3]

## C.        Cozzi's Age Discrimination Allegations

Plaintiff alleges that on repeated occasions during the 2002-2003 school year and after,

Baily asked her questions like "why are you working so hard?" and "don't you want to spend

more time with your grandchildren?" that Cozzi perceived reflected a discriminatory animus

stemming from her age.  (Cozzi Dep. Tr. at 35:7-22.)  Plaintiff also testified that sometime in

2001 or 2002, Principal Ross made age-related comments to her that she believed were

discriminatory.  Cozzi's best recollection of these comments is that Ross once told her he was

"surprised [she] didn't retire" and that he once asked her, in sum and substance, why she was not

retiring "along with all the other . . . old-timers" at the school.  (Id. at 47:11-18.)  Ross denies

making these remarks.

## D.        Defendants Prefer Disciplinary Charges Against Cozzi

On June 21, 2004, Principal Ross and district Superintendent, defendant William Shine,

acting pursuant to New York Education Law § 3020-a, filed charges against Cozzi alleging that

she had engaged in conduct constituting just cause for her dismissal as a tenured teacher at

GNUFSD.  The charges, which relied on the events detailed above and initially included an

---

[3] What, if anything, transpired in the time between Cozzi's discharge from the hospital and her
return to work the next day is the subject of disagreement.  Plaintiff states that after being
released from the hospital, she went straight home to recuperate.  Defendants, pointing to
deposition testimony from Baily, champion a different scenario.  According to Baily -- and to
defendants in their Local Rule 56.1 Statement -- she encountered plaintiff at a local photo shop
less than two hours after her trip to the hospital.  As this dispute is immaterial to defendants'
present motion, it poses no bar to summary judgment.

allegation that referenced plaintiff's authorship of the April 28 editorial, accused Cozzi of engaging in a long, uncorrected pattern of inappropriate and unprofessional behavior, including refusing to follow recommendations and instructions from her administrators, and incompetence. The school board, sitting in executive session, ruled by a unanimous vote that there was probable cause to support the charges and, on June 23, 2004, Cozzi was suspended with pay pending a final determination of the charges. This lawsuit followed.

## II.     DISCUSSION

### A.     Standard of Review for Summary Judgment

A district court must grant summary judgment if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried."  Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)).  Accordingly, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion, see, e.g., Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden then shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving party may

not satisfy its burden and defeat summary judgment by relying on "mere conclusory allegations [or] speculation," but rather "must offer some hard evidence showing that its version of the events is not wholly fanciful."  Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir.2004); Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).  If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

While a district court must be cautious about granting summary judgment in a discrimination case, where an employer's intent is at issue, Gallo v. Prudential Residential Services Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994), such cautiousness does not mean that summary relief under Rule 56 is simply unavailable, McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994).  Where no reasonable trier of fact could conclude that discrimination was a determinative factor in a defendant's actions, Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000), or where the nonmoving party "fails to make a showing sufficient to establish the existence of [any other] element essential to [its] case, and on which that party will bear the burden of proof at trial," summary judgment must be granted, Anderson, 47 U.S. at 247.  See also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases").

## B.  Section 1983 -- The First Amendment Retaliation Claim

Cozzi asserts that defendants violated her First Amendment rights by filing § 3020-a charges against her in retaliation for the April 28 editorial.  In order to survive a motion for summary judgment on a First Amendment retaliation claim, a plaintiff must set forth evidence

that "(1) [she] engaged in constitutionally protected speech because [she] spoke as [a] citizen[] on a matter of public concern; (2) [she] suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision." Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006); Gronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005). If the plaintiff "makes this required showing, defendants may nevertheless escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." Skehan, 465 F.3d at 106; Mandell v. County of Suffolk, 316 F.3d 368, 382-83 (2d Cir. 2003).

Defendants argue that Cozzi's retaliation claim must fail at the *prima facie* stage because plaintiff was not speaking as a citizen on a matter of public concern when she wrote the April 28 editorial. Even if the editorial were protected speech, however, defendants assert that they still are entitled to summary judgment because they would have brought § 3020-a charges against Cozzi, regardless of her speech, and because the April 28 editorial disrupted defendants' activities and the harm caused by that disruption outweighed the value of plaintiff's expression.

The question of whether a public employee's speech is constitutionally protected is one of law. Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). To answer it, a court must ask whether the plaintiff spoke as a citizen on a matter of public concern, or, instead, as an employee "pursuant to his duties." Garcetti v. Ceballos, 547 U.S. 410, 418, 421 (2006). The "matter of public concern" inquiry turns on "the content, form, and context of a given statement, as revealed by the whole of the record," Connick v. Myers, 461 U.S. 138, 147-48 (1983), and is not

dependent upon the motivation of the speaker, <u>Sousa v. Roque</u>, No. 07-cv-1892, slip op. at 3 (2d Cir. Aug. 21, 2009); <u>Reuland v. Hynes</u>, 460 F.3d 409, 411 (2d Cir. 2006).

Cozzi claims that her April 28 editorial constituted protected speech because it focused on issues of importance and interest to her community, namely, student preparedness for college, the college application process, and the role of AP courses and exams in the high school curriculum. Defendants, on the other hand, argue that Cozzi was speaking, not as a private citizen, but rather, in her official capacity as a South Great Neck teacher, and assert that her speech was motivated only by her personal grievances with defendants.

It is academic. Because the undisputed facts of this case permit disposition of Cozzi's retaliation claim without deciding the public concern issue, the Court declines to resolve that dispute here. Instead, the Court assumes, *arguendo*, that the April 28 editorial constituted protected speech and, additionally, that Cozzi has made a sufficient showing on each prong of her *prima facie* case.[4] <u>See</u> <u>Melzer v. Bd. of Educ.</u>, 336 F.3d 185, 196 (2d Cir. 2003) (assuming, *arguendo*, that plaintiff's expression was protected where resolution of the question was not critical to the outcome of the case); <u>Pappas v. Giuliani</u>, 290 F.3d 143, 146 (2d Cir. 2002) (same).

The short of it is that Cozzi's claim must fail because defendants have demonstrated that they would have taken the same adverse employment action against her, regardless of the views she espoused in the April 28 editorial. <u>See</u> <u>Crawford-El v. Britton</u>, 523 U.S. 574, 592 (1998); <u>Cotarelo v. Sleepy Hollow Police Dep't</u>, 460 F.3d 247, 253 (2d Cir. 2006). Defendants have proffered evidence establishing that plaintiff's supervisors were concerned about her teaching performance since as early as June 1998. As parent and student complaints mounted over time,

---

[4] While defendants argue that Cozzi failed to satisfy the public concern prong, they do not contest the remainder of her *prima facie* case -- that she suffered an adverse employment action when Ross and Shine filed § 3020-a charges against her, or that the temporal proximity between the speech and the proffer of charges establishes the required causal connection.

and as Principal Ross and Department Head Baily confirmed, with their own observations, the merit of these criticisms, they repeatedly expressed their concerns to plaintiff and highlighted particular areas in which she needed to improve. The record reveals that Ross, Baily, and GNUFSD Assistant Superintendent Bonner had repeatedly instructed plaintiff that specific aspects of her performance -- including weak class preparation and organizational skills, intemperate interactions with students and parents, and poor exam practices -- were unacceptable and had to be remedied, and had frequently counseled her on how she could do better. Nevertheless, many of these problems recurred, leading to increasingly blunt warnings from Cozzi's supervisors. Specifically, and as described more fully above, in July 2002, nearly two years prior to the publication of the April 28 editorial, Bonner expressed to plaintiff the administration's "extreme concern regarding [her] competence and performance." (Defs.' Ex. U at 1.) Following another difficult year, in May 2003, Bonner placed Cozzi on notice that if the administration's concerns were not remediated during the 2003-2004 school year, the school district would consider bringing § 3020-a charges against her. Notwithstanding this admonition, the deficiencies in plaintiff's performance persisted, causing Principal Ross to relieve Cozzi of her duties as an AP French teacher in March 2004 -- again, prior to the publication of the April 28 editorial -- and triggering defendants' preferring § 3020-a charges in June, just as Bonner had warned.

Plaintiff attempts to combat this barrage of evidence in two ways, neither of which is availing. First, she contends, in conclusory fashion, that there is no evidence to suggest that defendants intended to file § 3020-a charges before she spoke out in *The Southerner* in April 2004. This assertion lacks merit in light of the extensive factual development offered by defendants. Second, Cozzi argues that defendants' asserted justification for the § 3020-a charges

-- at bottom, her poor work performance -- was pretextual, and points to averments in her own declaration defending her conduct and performance. On this point, it is true that plaintiff's disagreements with her supervisors' criticisms may raise material disputes of fact. But they do not raise disputes that are genuine. See Jeffreys, 426 F.3d at 554. Cozzi's declaration, which for the most part does not controvert her own actions as much as it does her supervisors' assessments of her conduct, constitutes at most, only a scintilla of evidence in support of her version of events. Such a showing is insufficient to raise a *genuine* issue of material fact when evaluated together with the record as a whole, which includes extensive, contemporaneous, multi-sourced, documentary evidence of plaintiff's poor work performance. See Cotarelo, 460 F.3d at 253 (affirming summary judgment where plaintiff's performance record demonstrated that defendants would not have promoted him even had he not engaged in protected First Amendment activity); Figueroa v. Weisenfreund, No. 03-CV-3074, 2006 WL 3544712, at *10 (E.D.N.Y. Dec. 8, 2006) (granting summary judgment against plaintiff where the record revealed a pattern of complaints from a variety of sources and numerous examples of misconduct; plaintiff's attempts to defend his actions did not bar conclusion that he would have been fired regardless of his speech). Viewing all the evidence in the light most favorable to Cozzi, and drawing all reasonable inferences in her favor, Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005), the Court finds that the only reasonable conclusion permitted by the record is that defendants would have filed § 3020-a charges against plaintiff even had she not written the April 28 editorial. Accordingly, her First Amendment retaliation claim fails as a matter of law.[5]

---

[5] In light of this disposition, the Court need not consider defendants' alternate arguments in support of summary judgment.

**C.    Section 1983 -- The Due Process Claim**

Cozzi asserts that defendants violated her Fourteenth Amendment due process rights by suspending her from her teaching duties without a hearing.  This claim -- as well as plaintiff's argument in support of it on the motion -- is entirely conclusory and is without merit.

As an initial matter, it is well established that the disciplinary procedures outlined in § 3020-a provide "more than adequate procedural safeguards to satisfy the plaintiff's due process rights under the Fourteenth Amendment."  Montefusco v. Nassau County, 39 F. Supp. 2d 231, 239-40 (E.D.N.Y. 1999) (quoting Sullivan v. Bd. of Educ., 131 A.D.2d 836, 838, 517 N.Y.S.2d 197, 199 (2d Dep't 1987)).  Thus, to the extent plaintiff purports to mount a facial challenge to § 3020-a, that claim fails.  Alternatively, to the extent Cozzi argues that defendants did not comply with the § 3020-a procedures in her case, that argument is flatly contradicted by the record.  Defendants have proffered uncontested evidence that GNUFSD followed the requirements of § 3020-a precisely.  Superintendent Shine and Principal Ross filed charges against Cozzi in accordance with § 3020-a(1); the school board, meeting in executive session, determined unanimously that the charges were supported by probable cause, as required by § 3020-a(2); and following that finding, the board suspended plaintiff with pay pending a final determination of the charges -- as it was permitted to do under § 3020-a(2)(b).  Plaintiff neither disputes these facts nor explains why they do not satisfy the constitutional requirements of due process.[6]  Defendants' motion for summary judgment on this claim is therefore granted.

---

[6] Cozzi's assertion in her declaration that Principal Ross seemed "gleeful" when handing her the § 3020-a charges, and that he told her that she was "fired" (Cozzi Decl. ¶ 32), in no way alters the fact that the school district followed, step by step, the disciplinary procedures established by the statute.  Indeed, as of the time this motion was briefed, Cozzi had *not* been fired and a final adjudication of the charges remained pending.

**D.     The Disability Discrimination Claim**

Cozzi claims that defendants discriminated against her on the basis of a disability and, in so doing, violated her rights under the ADA.  Disability discrimination cases under the ADA are subject to the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002).  Under the McDonnell Douglas framework, a plaintiff first must establish a *prima facie* case of disability discrimination.  To do so, the plaintiff must show that (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability.  Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003). If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendants to provide a legitimate, nondiscriminatory reason for their employment decision.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  If the defendants meet that burden, the presumption of discrimination that attaches at the time plaintiff made out her *prima facie* case "drops out of the picture," St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993), and the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, "that the real reason for the adverse employment decision was discrimination," Mandell, 316 F.3d at 380-81; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Defendants argue that Cozzi has failed to establish a *prima facie* case of discrimination because she has not shown that she was disabled within the meaning of the ADA at step two, and because she raises no inference of discrimination at step four.  Assuming, without deciding, that plaintiff is afflicted by a disability, as defined by the ADA, defendants still are entitled to

summary judgment because Cozzi has not established that she suffered an adverse employment action because of her disability. Specifically, plaintiff (1) has not demonstrated that defendants knew that she was disabled within the meaning of the ADA at the time they brought § 3020-a charges against her; and (2) can show no link between her disability and the filing of the charges, even if defendants were aware of her condition.

## 1.    Cozzi Cannot Demonstrate that Defendants Were Aware of Her Disability

Defendants assert that no inference of discrimination flows from their preferring of § 3020-a charges because they lacked knowledge of Cozzi's disability. It is, of course, elemental that an employer could not have discriminated against a plaintiff *because of* her disability if it was unaware that the plaintiff was, in fact, disabled. Raytheon Co. v. Hernandez, 540 U.S. 44, 55 n.7 (2003) ("[i]f [an employer] were truly unaware that . . . a disability existed, it would be impossible for [its] hiring decision to have been based, even in part, on [plaintiff's] disability. And, if no part of the hiring decision turned on [plaintiff's] status as disabled, [plaintiff] cannot, *ipso facto*, have been subject to" discrimination); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 932-33 (7th Cir. 1995). Here, although plaintiff insists that there are at least three pieces of evidence which demonstrate that defendants were aware of her condition, the record belies that contention.

First, Cozzi states that defendants became aware of her disability shortly following its onset, as a result of her November 2002 car accident, when she asked Ross, Baily, and others for permission to teach out of a single classroom. Plaintiff's evidence on this point is her own deposition testimony, in which she states that she told her supervisors she wanted a single classroom because teaching in multiple classrooms forced her to walk distances that caused her pain. However, an employer's knowledge of a plaintiff's symptoms does not establish, as a

matter of law, that it knew the plaintiff was disabled.  See, e.g., Pacenza v. IBM Corp., No. 04-CV-5831, 2009 WL 890060, at *10 (S.D.N.Y. Apr. 2, 2009); Watson v. Arts & Entm't Network, No. 04-CV-1932, 2009 WL 793596, at *14 (S.D.N.Y. Mar. 26, 2008) (collecting cases).  Here, mere knowledge that Cozzi experienced pain while walking was insufficient, without more, to alert defendants to the fact that she suffered from a covered disability.  See Watson, 2009 WL 793596, at *14-15 (employer's knowledge of plaintiff's limitations on walking, as a result of a relatively mild workplace injury to her knee, did not put employer on notice that plaintiff was disabled under the ADA); Moore v. Time Warner GRC 9, 18 F. Supp. 2d 257, 261-62 (W.D.N.Y. 2000) (finding that "[m]ere knowledge that [plaintiff] suffered from diabetes or hypertension is not equivalent to knowing that his condition 'disabled' him within the meaning of the ADA").  And plaintiff cannot point to anything else:  Cozzi does not recall whether she provided defendants any other information regarding her condition (and defendants testify that she did not); she appears not to have documented in any way her request, or the reasons for it; and, notably, she does not dispute that she repeatedly had made the same request in the years prior to her car accident.  "While notice under the ADA . . . need not be precise[,] it must put the defendant sufficiently on notice of the existence and nature of the disability."  Goonewardena v. New York, No. 05-CV-8554, 2008 WL 4090467, at *10 (S.D.N.Y. Aug. 26, 2008) (internal quotations omitted).  Considering the information available to defendants at the time, a reasonable jury could not conclude that Cozzi's renewed request to teach out of a single classroom put defendants on notice of her disability.

Second, Cozzi claims that defendants knew of her disability because, in the spring of 2003, she repeatedly requested time off during the school day to obtain treatment from a physical therapist.  On one occasion, plaintiff asserts, Assistant Principal Newman even gave her a written

reprimand when her return from a therapy appointment was delayed. This argument quickly falls. Notwithstanding Cozzi's bald assertion, the record provides absolutely no suggestion that defendants were aware that her absences were a result of physical therapy. As to her allegation concerning the reprimand, defendants are correct that the only absence-related written reprimand from Newman in the record plainly states that the school administration believed she was absent because of a "dentist appointment".[7] (Defs.' Ex. Q at 1.) Thus, plaintiff's testimony that she attended physical therapy raises no genuine issue of material fact concerning defendants' knowledge of her disability.

Third, Cozzi argues that defendants must have learned that she was disabled in November 2003, when she suffered an apparent exacerbation of her physical ailments during school hours, informed Assistant Principal Newman and others -- but none of the named defendants -- that she had herniated discs, and, at the administration's order, was taken to a local emergency room for brief treatment. Here, again, however, plaintiff fails to provide evidence suggesting that defendants had information sufficient to conclude that Cozzi suffered from a disabling condition within the meaning of the ADA. The uncontested record shows that Cozzi reported to work the day after the incident in question, and there is no evidence that she ever again mentioned what had happened or subsequently raised with her supervisors any issue regarding her physical condition. Indeed, though she seeks to attribute great significance to the event in her brief on the motion, plaintiff admitted at her deposition that the incident, without more, would not have caused a rational person to believe she was disabled. (Cozzi Dep. Tr. at 180:13-21.) Of course, Cozzi asserts that at the time of incident, she told Assistant Principal Newman and several other

---

[7] Oddly for both sides, this reprimand -- which is, again, the only one contained in the record -- is dated February 8, 2002. Thus, it predates Cozzi's car accident (and alleged disability) by roughly nine months. Whatever else this chronology suggests, it does *not* in any way substantiate plaintiff's claim that defendants knew she was missing time from work because of a disability.

staff members that she had several herniated discs. But this is far from sufficient. Notably, Cozzi did not disclose this information to any of the named defendants, and there is no evidence that the supervisor-defendants who were responsible for bringing the § 3020-a charges against her, Principal Ross and Superintendent Shine, ever learned that she suffered from such an ailment. See Hedberg, 47 F.3d at 931-32; (holding that plaintiff who told his immediate supervisor that he was disabled could not establish a *prima facie* case where there was no evidence that the decisionmaker responsible for his termination also knew). Moreover, even assuming the defendants were aware of the herniated discs, that information was not enough to put them on notice that Cozzi was disabled by her condition, within the meaning of the ADA. See Cotz v. Mastroeni, 476 F. Supp. 2d 332, 346, 370 (S.D.N.Y. 2007) (plaintiff who told defendant that she had a "bad back" and that it was difficult for her to sit for long periods failed to put defendant on notice that she suffered from a covered disability); Kolivas v. Credit Agricole, No. 95-CV-5662, 1996 WL 684167, at *5 (S.D.N.Y. Nov. 26, 1996) (employer's knowledge that plaintiff "had just seen a psychiatrist, had been prescribed medication, was depressed, and needed a week off from work" was insufficient to alert employer that plaintiff was disabled under the ADA); see also Moore, 18 F. Supp. 2d at 261-62. Accordingly, defendants cannot be charged with knowing that plaintiff was disabled at the time they took the challenged adverse employment action and thus could not have discriminated against her on the basis of her disability.

2.      **The Record Does Not Permit the Inference that Defendants Filed Charges Against Cozzi Because of Her Disability**

Even if the defendants were aware of Cozzi's disabling condition, however, the record still is devoid of any indication that they filed charges against her because of her disability. It is absolutely true, as Cozzi maintains, that discrimination may be inferred in a variety of ways.

27

However, no inference arises here, where the only link between the disability and the filing of charges is plaintiff herself. Cozzi argues that the Court should divine discrimination from the fact that defendants took no disciplinary action against her prior to her disability despite the fact that she had been consistently reprimanded before her November 2002 car accident. Plaintiff is quite correct that her work performance was repeatedly criticized prior to the accident; so too, was it frequently found deficient in the more than 18 months between the accident and defendants' decision to bring charges and seek her dismissal, in June 2004.[8] Cozzi's speculative claim that it was her disability which caused her to be brought up on charges is wholly inadequate at the summary judgment stage. Pace v. Paris Maint. Co., 107 F. Supp. 2d 251, 262 (S.D.N.Y. 2000) (finding that plaintiff failed to make out *prima facie* case, even assuming defendants knew of his disability, where the record demonstrated no link between the adverse employment action and plaintiff's condition); Starr v. Legal Aid Soc'y, No. 96-CV-6888, 1998 WL 477733, at *4 (S.D.N.Y. Aug. 14, 1998).

E.      **The Age Discrimination Claim**

Cozzi's final federal claim alleges that defendants discriminated against her on the basis of her age, in violation of the ADEA. Claims brought under the ADEA, like those arising from the ADA, are subject to the McDonnell Douglas three-step burden-shifting analysis. D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 194-95 (2007). In order to establish a *prima facie* case under the ADEA, a plaintiff must show (1) she was a member of the protected age group; (2) she was qualified for the job at issue; (3) she suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. Id. at

---

[8] And of course, this record of poor performance illuminates why plaintiff's claim cannot succeed, even if she were to make out a *prima facie* case: she cannot overcome defendants' showing that they would have taken the same employment action against her, even in the absence of any disability. See Holcomb v. Iona Coll., 521 F.3d 130, 138 (2008).

195. If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the employment action. Id. If the defendant meets this burden, the plaintiff may no longer rely on the presumption raised by the *prima facie* case and "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2351 (2009).

Defendants argue that they are entitled to summary judgment at the *prima facie* stage because Cozzi cannot show that she was qualified for her teaching position and because no inference of discrimination attaches to their decision to bring disciplinary charges against her. Failing these arguments, defendants also assert that Cozzi's claim falls flat because they have provided a legitimate nondiscriminatory reason for the employment action that she cannot rebut.

As to the first point, the Court disagrees with defendants' assessment, at step two of the *prima facie* case, that Cozzi was not qualified for her job. The Second Circuit has held that to "show 'qualification' . . . the plaintiff need not show perfect performance or even average performance. Instead, she need only make the minimal showing that *she possesses the basic skills necessary for performance of the job.*" Gregory v. Daly, 243 F.3d 687, 697 (2d Cir. 2001) (internal quotations omitted). Cozzi certainly satisfies that standard.

However, the age discrimination claim, like the ADA claim before it, fails at the fourth step of the *prima facie* case because the factual record does not support an inference of discrimination. The full quantity of Cozzi's evidence in this regard is her own testimony that Baily and Ross made several stray remarks that she believed related to her age and were discriminatory. As an initial matter, the Court doubts whether Baily's remarks are indicative of animus of any sort. Even assuming they are, however, and that Cozzi's sum and substance

recollection of Ross's statement is accurate, see Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (on summary judgment, courts must resolve all factual ambiguities and credit all reasonable inferences in favor of the nonmoving party), she does not create a genuine issue of material fact that forestalls summary judgment. It is well-established that isolated, stray remarks, even if made by a decisionmaker, do not, *without more*, constitute sufficient evidence to support an inference of discrimination. Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998); see also Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007) (noting that "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be"). Cozzi can identify no nexus between the comments and the filing of charges, nor can she identify any other evidence tending to establish discriminatory intent.[9] Accordingly, she cannot make out a *prima facie* case of age discrimination.

Of course, even if the Court were to deem these remarks sufficient to establish a *prima facie* case, Cozzi's claim still would founder because, again, she cannot overcome defendants' showing that they would have taken the same employment action against her, in any event. A reasonable fact-finder confronted with plaintiff's longstanding record of poor performance, elaborated above, could only conclude that defendants would have brought charges against Cozzi, regardless of her age. Summary judgment for defendants is therefore granted.

---

[9] To the extent Cozzi asserts that she was replaced at South Great Neck by a younger teacher, and that age discrimination may be inferred on that basis -- a theory advanced in passing in the Statement of Facts section of her brief, and nowhere else -- she still cannot defeat summary judgment. There is absolutely no record evidence to indicate that plaintiff's direct replacement was younger than she, and indeed, defendants assert that she was older. Nor can Cozzi identify any fact showing that defendants chose an immediate replacement who was older merely to insulate themselves from ADEA liability. McCarthy v. New York City Technical Coll., 202 F.3d 161, 165 (2d Cir. 2000). This speculation thus fails to support an inference of discrimination.

**F.      The New York State Law Claims**

Finally, in addition to her federal causes of action, Cozzi asserts claims for age and disability discrimination under New York law. The legal standards for age discrimination under the ADEA and NYSHRL are the same, Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001), as are those for disability discrimination under the ADA and NYSHRL, except that New York law provides a broader definition of "disability", Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 156-57 (2d Cir.1998), a distinction not relevant to the disposition of this case. Accordingly, for the reasons set forth in Sections II.D. (disability discrimination) and II.E. (age discrimination), *supra*, defendants' motion for summary judgment on Cozzi's NYSHRL claims is granted, as well.

**III.      CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment for defendants and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
         August 21, 2009


                              ____s/ENV_____
                              ERIC N. VITALIANO
                              United States District Judge